# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------- x

In re:                          :     Chapter 11
                                :
JGW HOLDCO, LLC, *et al.* [1]   :     Case No. _____ (___)
                                :
Debtors.                        :
---------------------------------------------------- x

## DECLARATION OF DAVID MILLER IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

I, David Miller, hereby declare under penalty of perjury:

1.    On the date hereof (the "Petition Date"), JGW Holdco, LLC ("Holdco"), J.G. Wentworth, LLC ("JGW") and J.G. Wentworth, Inc. ("JGW Inc.") as debtors and debtors-in possession herein (collectively, the "Company" or the "Debtors") each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code") in this Court. I have served as the Chief Executive Officer of each of the Debtors since January 2009, and became a director of JGW Inc. and manager of JGW in March 2009. I have served as chief executive officer, manager and director of certain of JGW's other affiliates since March 2009. I am, therefore, familiar with the Debtors' day-to-day operations, businesses and financial affairs.

2.    To minimize the uncertainty associated with the commencement of a bankruptcy case, the Debtors have filed a number of motions requesting various types of relief from the Court (individually, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief aimed at streamlining the Debtors' chapter 11 cases and each of the First

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: JGW Holdco, LLC (3908), J.G. Wentworth, LLC (4647) and J.G. Wentworth, Inc. (9853). The mailing address for the Debtors is 40 Morris Avenue, Bryn Mawr, PA 19010.

Day Motions is crucial to the Debtors' efforts to reorganize and maximize creditors' recoveries in an orderly manner.

3. In accordance with the Local Rules and given the nature of these cases, the Debtors have requested that the Court schedule a hearing at its earliest convenience to consider the First Day Motions. The Debtors will continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' voluntary chapter 11 petitions and various motions and applications of the Debtors filed with the Court contemporaneously herewith.[2] Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

5. This Declaration is divided into two parts. Part I describes the J.G. Wentworth Entities'(as defined herein) businesses, the Debtors' prepetition organizational and capital structure, the circumstances leading to the chapter 11 filings, the Prepackaged Plan of

---

[2] Reference is also made to the Debtors' Disclosure Statement, dated May 7, 2009, for the Prepetition Solicitation of Votes With Respect to Prepackaged Plan of Reorganization for JGW Holdco, LLC, J.G. Wentworth, LLC and J.G. Wentworth, Inc. (the "Disclosure Statement"). A copy of the Disclosure Statement has been filed contemporaneously with this Declaration and is incorporated herein by reference. The Disclosure Statement includes additional information regarding J.G. Wentworth (as defined below), its business and its corporate and capital structure.

Reorganization for JGW Holdco, LLC, J.G. Wentworth, LLC and J.G. Wentworth, Inc., dated May 7, 2009 (the "Prepackaged Plan" or the "Plan"),[3] and the solicitation of acceptances and rejections thereof. Part II sets forth the relevant facts in support of each of the First Day Motions.

PART I

**A.    General**

6.    The Debtors, through their operating subsidiaries (the "J.G. Wentworth Entities" or sometimes referred to as its "non-debtor affiliates" and the business enterprise as a whole, "J.G. Wentworth"), are direct-to-consumer purchasers of illiquid insurance products issued by highly rated financial institutions in the United States. The Debtors are holding companies and do not conduct business except through the J.G. Wentworth Entities.

7.    The assets that J.G. Wentworth purchases have been regularly securitized or sold primarily for cash that exceeds its purchase price. J.G. Wentworth has developed its position as a purchaser of structured settlements and fixed-payment annuities through its highly recognizable brand and multi-channel direct-to-consumer marketing platform.

8.    Founded in 1992, J.G. Wentworth is headquartered in Bryn Mawr, PA, and as of December 31, 2008, employed 76 employees. Due to worsening economic conditions resulting in higher funding costs, in December 2008, J.G. Wentworth reduced its workforce by 120 employees to support lower advertising and purchasing. None of the employees are covered by a collective bargaining agreement or represented by an employee union.

9.    Structured settlements are financial tools used by insurance companies to settle claims on behalf of their customers. They are contractual arrangements under which an

---

[3] Except as otherwise provided herein, capitalized terms not otherwise defined in this Declaration shall have the meanings ascribed to them in the Prepackaged Plan.

3

insurance company agrees to make fixed, periodic payments to an individual as compensation for a claim typically arising out of a personal injury. According to the National Structured Settlement Trade Association (US), or NSSTA, over $100 billion in premiums for structured settlements were issued in the United States from 1979 through 2007. The premiums paid for structured settlements approximate the present value of the aggregate payment streams underlying the structured settlements. Most of the issuers of these structured settlements have high financial strength ratings (primarily "A–" rated or higher) and, as a result, the credit risk associated with the structured settlements J.G. Wentworth purchases is minimal. Additionally, the structured settlements J.G. Wentworth purchases have long average lives and cannot be prepaid.

10. J.G. Wentworth serves the liquidity needs of structured settlement holders and fixed-payment annuity holders by providing its clients with cash in exchange for a certain number of fixed, scheduled future payments. Clients desire liquidity for a variety of reasons, including housing, debt reduction, business opportunities, education and healthcare costs. Since its inception, J.G. Wentworth has completed more than 51,700 guaranteed and life contingent structured settlement transactions with aggregate payment streams of approximately $4 billion. Every structured settlement purchase J.G. Wentworth has made since June 2000 has been reviewed and approved by a judge. J.G. Wentworth believes that the Company has purchased more than 50% of the structured settlements sold in the domestic secondary market to date, although market share is difficult to estimate because its industry is highly fragmented. For the years ended December 31, 2007, and December 31, 2008, J.G. Wentworth purchased structured settlements with aggregate payment streams of $728 million and $728 million, respectively.

46750/0001-5539858v8

11.     J.G. Wentworth's highly recognizable brand generates inbound inquiries to its purchasing group. There are no readily available lists of holders of structured settlements or fixed-payment annuities so brand awareness is important to growing market share in its industry. Over the past 14 years, J.G. Wentworth has invested more than $204 million in marketing to establish its brand name and product awareness through multiple media outlets. J.G. Wentworth believes that its marketing efforts have established the "J.G. Wentworth" name as the most recognized brand in the industry. As its clients complete on average more than two transactions with J.G. Wentworth, the Company believes its database provides it with a strong pipeline of predictable purchasing opportunities with low incremental acquisition cost. As of March 31, 2009, the Company's existing client database included more than 15,700 existing clients with approximately $8.5 billion of unpurchased payment streams. The Company's prospective client database, as of March 31, 2009, included approximately 40,800 prospective clients who hold unpurchased guaranteed and life-contingent structured settlement and fixed-payment annuity streams.

12.     J.G. Wentworth funds the purchase of structured settlements and fixed-payment annuities with short and long term non-recourse financing. Prior to May 6, 2009, J.G. Wentworth funded the purchase of structured settlements and fixed-payment annuities through a committed $250 million secured warehouse facility maintained with Deutsche Bank (as more particularly described below, the "Warehouse Facility"). See ¶ 24. The structured settlements and annuities purchased were discounted at a higher rate than the discount rate applied in the Warehouse Facility resulting in excess cash (the "Over Advance Rate") at the time of purchasing the structured settlements and annuities. For the years ended December 31, 2007, and December 31, 2008, the Warehouse Facility provided an average of 133% and 121%, respectively, of the

5

purchase price to J.G. Wentworth in available cash at the time of purchase. These available cash amounts have typically exceeded the direct and indirect costs of J.G. Wentworth's origination activities. In addition, upon the securitization or sale of these assets, J.G. Wentworth received incremental cash or was required to pay additional cash which, together with the amounts from the Warehouse Facility, was on average 139% and 116% of the purchase price for the years ended December 31, 2007 and December 31, 2008, respectively. Warehouse lender Deutsche Bank repriced the existing portfolio twice in September 2008, and once again in October 2008. As set forth in more detail in the Disclosure Statement, in October 2008, Deutsche Bank agreed to temporarily freeze warehouse pricing in return for the completion of certain financing transactions. On May 5, 2009, Deutsche Bank ceased advancing on the Warehouse Facility, necessitating the implementation of a "priming loan" as more particularly described below. See ¶ 25.

13. The chart below sets forth JGW Inc. and its subsidiaries' audited consolidated statement of operations for the years ending 2006 through 2008. For purposes of this chart, Successor refers to JGW, Inc., on a consolidated basis, and Predecessor refers to Holdco (prior to April 2007, JGW) on a consolidated basis.

## J.G. WENTWORTH, INC. AND SUBSIDIARIES
## AUDITED CONSOLIDATED STATEMENT OF OPERATIONS

| | Successor | | Predecessor |
|---|---|---|---|
| | Year Ended December 31, | | |
| | 2008 | 2007 | 2006 |
| | ($ in thousands) | | |
| **REVENUES** | | | |
| Gain on sale of finance receivables | $62,434 | $93,460 | $98,125 |
| Gain (loss) on swap termination | (19,932) | 290 | (2,052) |
| Interest income | 28,875 | 18,837 | 15,035 |
| Unrealized gains (losses) on retained interests, servicing assets and derivatives | (74,000) | (14,157) | 8,279 |
| Servicing, broker and other | 6,459 | 6,348 | 5,495 |
| Total revenue | $3,836 | $104,778 | $124,882 |
| | | | |
| **EXPENSES** | | | |
| Advertising | 39,778 | 44,432 | 32,632 |
| Interest expense | 40,627 | 40,301 | 25,265 |
| Salary and benefits | 14,351 | 20,727 | 12,180 |
| General and administrative | 6,349 | 5,530 | 4,210 |
| Debt termination expense | – | 16,900 | 4,719 |
| Impairment of intangibles | 115,577 | – | – |
| Professional and consulting fees | 9,040 | 5,959 | 4,120 |
| Share-based compensation | 3,975 | 5,797 | 2,381 |
| Loss on discontinuance of cash flow hedges | – | 6,786 | – |
| Management fees | – | 1,243 | 1,872 |
| (Reversal of) provision for losses on finance receivables | 65 | 3 | (64) |
| Depreciation and amortization | 3,870 | 2,934 | 3,148 |
| Total expenses | $233,632 | $150,612 | $90,463 |
| | | | |
| Income (loss) before loss attributed to predecessor shareholders and income taxes | ($229,796) | ($45,834) | $34,419 |
| Loss attributed to predecessor shareholders prior to August 10, 2007 | – | (20,290) | |
| Loss before income taxes | (229,796) | (25,544) | |
| Income tax (expense) benefit | (1,806) | 1,806 | |
| Net loss attributed to Class A shares | ($231,602) | ($23,738) | |

| | | August 10 through December 31 |
|---|---|---|
| Earnings per Class A share | | |
| Net loss attributed to Class A shares, basic | ($19.90) | ($2.05) |
| Net loss attributed to Class A shares, diluted | ($19.90) | ($2.05) |
| Weighted average number of Class A shares outstanding, basic | 11,640,797 | 11,593,342 |
| Weighted average number of Class A shares outstanding, diluted | 11,640,797 | 11,593,342 |

## B.     Corporate Structure and Ownership

14.     In July 2005, the private equity firm of JLL Partners ("JLL") and certain members of J.G. Wentworth's then senior management team purchased certain companies controlled by members of J.G. Wentworth's then senior management team that were engaged primarily in the purchase of structured settlements.  These equity interests are held directly or indirectly by

7

Holdco, which was formed in 2007 and became a holding company for JGW in April 2007. In August 2007, Holdco sold certain interests and the existing members of Holdco sold certain of their interests therein to a newly formed corporation, JGW Inc. As more fully described in the Disclosure Statement, in 2008, JLL increased its investment in Holdco and JGW Inc.

15. Subsequently, on April 15, 2009 and April 16, 2009, certain holders of Holdco Common Interests exercised their right under the Third Amended and Restated Limited Liability Company Agreement of Holdco, dated as of November 21, 2008, and exchanged all Holdco Common Interests and their related JGW Inc. Class B Shares that they held beneficially for JGW Inc. Class A Shares. Also on April 16, 2009, but after the exchange described in the previous sentence took place, JGW Merger Sub, LLC, a wholly owned subsidiary of Holdco, was merged with and into Holdco with Holdco continuing as the surviving entity. In the merger, all remaining Holdco Common Interests other than those held by JGW Inc. and Distribution LLC were cancelled and retired for no consideration. As a result of these transactions, JGW Inc. and Distribution LLC became the sole holders of Holdco Common Interests.

16. On May 3, 2009, Distribution LLC exercised its option to convert its preferred interests in Holdco to Holdco Common Interests. Including accrued and unpaid interest, immediately prior to the conversion, Distribution LLC owned 22,027 preferred interests in Holdco, convertible into 88,108,000 Holdco Common Interests. After execution of the conversion, JGW Inc. and Distribution LLC, respectively, owned 16.6781% and 83.3219% of Holdco Common Interests. On May 4, 2009, each of Holdco and JGW Inc. effected a 1,000,000-to-1 reverse stock split with respect to their respective common equity securities. Immediately following the reverse stock split, each previously outstanding share of common stock of JGW Inc. was converted into one millionth (0.000001) of a share of common stock of JGW Inc. and

8

each previously outstanding Holdco Common Interest was converted into one millionth (0.000001) of a Holdco Common Interest.

17.    In connection with those transactions, the prepetition equity structure of the Debtors is set forth in the chart below:



18.    The remaining J.G. Wentworth Entities are directly or indirectly owned by JGW as reflected in the chart below.



## C.  Pre-Petition Indebtedness

19.  ***Term Loan Agreement.***  On or about April 4, 2007, JGW entered into that certain First Lien Credit Agreement with certain of its subsidiaries as guarantors, certain lenders, Bear Stearns Corporation Lending Inc., as syndication agent, Deutsche Bank Trust Company Americas, as administrative agent, Deutsche Bank Securities Inc. and Bear, Stearns & Co. Inc., as joint lead arrangers and Deutsche Bank Securities Inc., Bear, Stearns & Co. Inc. and Goldman Sachs Credit Partners L.P., as joint book runners, and Wilmington Trust as successor administrative agent, as amended, supplemental or otherwise modified prior to the Petition Date. The guarantors under the Term Loan Agreement are non-debtor affiliates: (i) J.G. Wentworth S.S.C. Limited Partnership, J.G. Wentworth Structured Settlement Funding II, LLC, J.G. Wentworth Management Company, LLC, 321 Henderson Receivables Origination, LLC, Qualified Provider Associates, LLC, Green Apple Management Company, LLC and Red Apple Management Company, LLC; and (ii) any of JGW's subsidiaries that in the future executes a guarantee supplement to the applicable lien credit agreement.

20.  As of the Petition Date, the principal amount outstanding under the Term Loan Agreement is $325 million.  The $325 million Term Loan Agreement matures in April 2014. Borrowings under the Term Loan Facility were used to repay the Company's prior outstanding $225 million term loan, to make a distribution payment to members, and to pay fees and expenses related thereto.  In connection with the Term Loan Facility, JGW granted to the Term Lenders a lien on its and each of the guarantor's assets, which include trademarks and client lists, and a pledge of the capital stock of each of the guarantors and each of 321 Henderson Receivables Acquisition LLC, RC Henderson LLC and J.G. Wentworth Life Settlements, LLC.

21.     The interest on the $325 million Term Loan Agreement accrues, per annum, at LIBOR plus 225 basis points. Default interest is an additional 200 basis points on any overdue principal or interest. Interest payments are due quarterly.

22.     Events of default under the Term Loan Facility include, but are not limited to, JGW's failure to pay any interest within 30 days after its due date, JGW's failure to make any principal payment when due, JGW's continued default under covenants after receiving notice, and JGW's failure to maintain certain security interests. Neither Holdco nor JGW Inc. is a borrower or guarantor under the Term Loan Agreement.

23.     *Derivatives.* JGW entered into derivative transactions with Deutsche Bank on May 12, 2006 and April 4, 2007 under global reference numbers N476531N, N596166N, N596213 and N596215N, as evidenced and confirmed by letter agreements between Deutsche Bank and JGW dated April 9, 2007 and April 10, 2007. The Derivatives were terminated on or about April 22, 2009. The termination of the Derivatives resulted in termination liability. As of the Petition Date, the termination value of the Derivatives is the sum of (x) $41,917,000 plus accrued and unpaid interest on such amount between April 22, 2009 and the Petition Date plus (y) $3,120,937.50 plus accrued and unpaid interest on such amount between April 1, 2009 and the Petition Date (the "Termination Value"). Deutsche Bank's interests in the collateral securing JGW's obligations under the Derivatives are on a *pari passu* basis with the collateral securing JGW's obligations under the Term Loan Facility. Neither JGW Inc. nor Holdco is a party to the Derivatives and do not have any obligation for the Termination Value.

24.     *Warehouse Credit Facility.* On March 23, 2006, JGW's indirect subsidiary, 321 Henderson Receivables Acquisition LLC, as borrower, entered into a secured revolving warehouse credit facility with J.G. Wentworth Management Company, LLC, as master servicer,

the lenders thereunder, and Deutsche Bank AG, New York Branch, as agent (the "Warehouse

Facility"). This facility has a commitment of $250 million, which by its terms terminates in July

2010 (unless terminated sooner). This Warehouse Facility allows JGW's affiliate(s) to draw

funds to finance the purchase of financial assets such as structured settlements and annuities.

Proceeds from securitizations are used to pay down the Warehouse Facility. Accrued but unpaid

interest on any amounts outstanding under the Warehouse Facility are due monthly. Events of

default under this Warehouse Facility include, but are not limited to, the failure to make any

required payment of principal or interest when due, the breach of a representation or warranty

that is not cured within thirty days of notice, the failure to observe certain material terms of the

credit facility, and a change in control of the borrower. The terms of the Warehouse Facility

were significantly modified in 2008 and in the first quarter of 2009, and, as described below,

Deutsche Bank ultimately ceased funding the line effective May 5, 2009. Thereafter, on May 14,

2009, J.G. Wentworth received a termination notice from Deutsche Bank.

25. ***Priming Loan.*** In order to provide a source of funds for ordinary course

operations by the J.G. Wentworth operating subsidiaries, including funds for continued purchase

of structured settlements, on May 6, 2009, Distribution LLC, an entity affiliated with JLL,

provided the Company with that certain senior secured priming loan in an amount not to exceed

$10 million, with the consent of the requisite number of Term Lenders. It is anticipated that the

amounts outstanding and the obligations arising under the Priming Loan will be paid off by or

"rolled-up" into the DIP Facility (as defined and further described below). The total aggregate

amounts loaned to the Company by Distribution LLC and any other participating Lenders,

whether pursuant to the Priming Loan or the DIP Facility, is not expected to exceed $10 million

based on a budget through June 1, 2009.

12

## D. Events Leading to Restructuring and Chapter 11 Filing

26. As noted above, until shortly before the Petition Date, J.G. Wentworth funded structured settlement and annuity purchases through the Warehouse Facility with Deutsche Bank. This facility, by its terms, matures in July 2010 (unless terminated sooner). The Company and its non-debtor affiliates have managed interest rate exposure by entering into interest rate swap contracts with Deutsche Bank to convert warehouse funding cost to a fixed rate. This fixed rate is then used to discount the periodic payments to determine the principal amount of funds that are available to be drawn on the secured warehouse facility. The structured settlements and annuities that the Company and its non-debtor affiliates purchase are discounted at the Over Advance Rate at the time of purchasing the structured settlements and annuities. This excess cash is used to pay operating expenses to support the business.

27. The discount rate applied in the Warehouse Facility used to determine the Over Advance Rate is based on the estimated market terms of a securitization, less certain lender reserves. When securitization market conditions fluctuate, the discount rate used in the secured warehouse facility may be adjusted by the lender resulting in fluctuations in the value of the structured settlements we purchase. In instances in which J.G. Wentworth's borrowing base availability is less than the amount drawn under the secured warehouse facility, J.G. Wentworth is required to repay on an accelerated basis the portion of the loan that exceeds the borrowing base availability, also referred to as a "margin call."

28. As a result of wider credit spreads in the market during 2008, the warehouse borrower received a series of margin calls totaling $37.0 million, as follows: $8.0 million in the first quarter of 2008; $12.1 million in the third quarter of 2008; and $16.9 million in the fourth quarter of 2008. The margin call in the first quarter of 2008 was paid from cash on hand at the Company's affiliates. The margin call in the third quarter of 2008 was paid with a portion of the

13

$20.0 million of proceeds received in connection with a September 9, 2008 borrowing from an affiliate of JLL, Distribution LLC. These margin calls were all fully satisfied.

29.     The margin call in the fourth quarter of 2008 was not satisfied. On November 28, 2008, the warehouse borrower, 321 Henderson Receivables Acquisition LLC ("321 Henderson"), obtained a formal extension from Deutsche Bank of the waiver set to expire on November 21, 2008, related to its $16.9 million margin call made on October 22, 2008. The waiver provided for a standstill of the October 22, 2008 margin call and any further margin calls until March 20, 2009, provided certain conditions were met. The key conditions required a $50 million reduction in the outstanding indebtedness under the Warehouse Facility and $9.9 million in additional cash to the Debtors or their subsidiaries (either through capital contributions or sale of assets) by December 19, 2008.

30.     On December 19, 2008, J.G. Wentworth closed its 2008-3 securitization. J.G. Wentworth sold $74.6 million Class A-1 Notes rated Aaa and aaa by Moody's and AMBest, respectively, at a price of 90.625% and raised $67.6 million of gross proceeds from the transaction. Approximately $52.4 million of proceeds net of expenses were used to reduce warehouse loan indebtedness as required under the November 28, 2008 margin call waiver agreement with Deutsche Bank. An additional $12.3 million of proceeds were used in connection with interest rate swap termination costs. The 2008-3 securitization resulted in the sale of bonds through 79.5% of the capital structure at an effective yield to investors of 9.85%. Prior securitizations typically resulted in sale of bonds through 94.5% of the capital structure. The cash proceeds received net of expenses was less than the amount required to satisfy warehouse funds borrowed by $24.4 million. In addition, $14.1 million of subordinated bonds

14

from the December 2008 securitization was retained and pledged as collateral to the warehouse facility.

31.    Also on December 19, 2008, as an additional condition to the November 28, 2008 margin call waiver agreement, $5.6 million of cash was provided to Holdco by Distribution LLC in the form of a capital contribution through Distribution LLC's purchase of additional Holdco Common Interests.  In addition, LCSS LLC, a direct wholly-owned subsidiary of Distribution LLC, purchased unencumbered Life Contingent Settlement Receivables from a subsidiary of Holdco for approximately $4.3 million.  These two transactions increased cash by $9.9 million as required under the November 28, 2008 margin call waiver agreement with Deutsche Bank.  The purchase of unencumbered Life Contingent Settlement Receivables by LCSS LLC was completed at a price to yield 15% per annum.  The book value of these receivables was approximately $6.2 million, resulting in a loss to the Company and/or its non-debtor affiliates of $1.9 million on the transaction.  The $5.6 million capital contribution was completed in connection with the issuance by Holdco of 22,400,000 Holdco Common Interests to Distribution LLC at a price of $0.25 per Holdco Common Interest.  As a result of the sale of these Holdco Common Interests and the dilution protection provisions afforded the preferred interests in Holdco previously issued to Distribution LLC, as of January 13, 2009, the number of Holdco Common Interests to be issued on conversion of the preferred interests in Holdco has increased to 84,228,000, based on the new reference price of $0.25.  On May 3, 2009, Distribution LLC exercised its option to convert its preferred interests in Holdco to Holdco Common Interests. Including accrued and unpaid interest, immediately prior to the conversion, Distribution LLC owned 22,027 preferred interests in Holdco, convertible into 88,108,000 Holdco Common Interests.  After execution of the conversion, JGW Inc. and Distribution LLC, respectively,

15

owned 16.6781% and 83.3219% of Holdco Common Interests. On May 4, 2009, Holdco and JGW Inc. each executed a reverse 1,000,000 to 1 stock split.

32.      Separately, on November 25, 2008, JGW received ratings action from both Standard & Poor's Ratings Service ("Standard & Poor's") and Moody's Investor Services ("Moody's") that reduced its debt ratings to "CCC+" (credit watch negative) and "Caa1" (review for possible downgrade). In March 2009, Standard & Poor's and Moody's further downgraded the Company to "CC" and "Ca", respectively. In May 2009, the Company received a further downgrade from Moody's to "C".

33.      Advances under the Warehouse Facility were limited to approximately $46.2 million during the waiver period that expired on March 20, 2009. The interest rate on outstanding warehouse advances prior to November 28, 2008 was the Deutsche Bank commercial paper rate, plus 4.5%, and for warehouse advances on or after November 28, 2008, the interest rate is the Deutsche Bank commercial paper rate, plus 8.0%.

34.      On March 23, 2009, 321 Henderson obtained an extension from Deutsche Bank of the November 28, 2008 waiver related to its October 22, 2008 $16.9 million margin call. The waiver provided for a standstill of the October 22, 2008 margin call and any further margin calls until April 22, 2009. Advances under the Warehouse Facility were limited to approximately $12.0 million during the waiver period that was set to expire on April 22, 2009. The interest rate on outstanding warehouse advances was the Deutsche Bank commercial paper rate, plus 6.0%. On April 24, 2009, 321 Henderson obtained an additional extension of the April 22, 2009 margin call until April 30, 2009. On May 1, 2009, the waivers expired. The J.G. Wentworth Entities did not satisfy the margin calls and, as a result, the use of the Warehouse Line ceased to be available, effective May 5, 2009. On May 11, 2009, Deutsche Bank sent 321 Henderson a

warehouse facility margin call notice for $52.8 million. 321 Henderson did not pay the margin call as demanded (by May 12, 2009) and, as a result, both the Warehouse and residual debt facilities are in default. On May 14, 2009, J.G. Wentworth received a termination notice from Deutsche Bank. Commencing with the cessation of funding by Deutsche Bank, J.G. Wentworth began drawing funds necessary to operate its business through the Priming Loan as part of the restructuring discussed below.

35.     In response to the tightening credit markets and limitations on advances under the Warehouse Facility, and as part of J.G. Wentworth's continuing efforts to reduce costs and expenses, it conducted a reduction of staff on December 4, 2008. Approximately 120 of 200 jobs were eliminated, and J.G. Wentworth's Nevada call center office was closed. The remaining staff is focused on servicing the existing securitization portfolio and purchasing core guaranteed structured settlement and fixed-payment annuity payments. The reduction in staff resulted in severance costs of approximately $1.3 million and a reduction of ongoing compensation cost of approximately $6.8 million per annum.

36.     The Company and its non-debtor affiliates recently increased prices on structured settlement and annuity purchases, resulting in higher purchase yields that may act to offset the reduction in the Over Advance Rate. In addition, the Company and its non-debtor affiliates have reduced marketing expenditures from prior levels and reduced personnel to maximize the use of J.G. Wentworth's cash. The reduced marketing expenditures have resulted in lower transaction volume adding further pressures to maintain positive cash flow.

37.     For the years ended December 31, 2007, and December 31, 2008, the Warehouse Facility provided an average of 133% and 121%, respectively, of the purchase price to the Company and/or its non-debtor affiliates in available cash at the time of purchase. These

17

available cash amounts have typically exceeded direct and indirect costs. In addition, upon the securitization or sale of these assets, J.G. Wentworth receives incremental cash or are required to pay additional cash which, together with the amounts from the warehouse facility, was on average 139% and 116% of the purchase price for the years ended December 31, 2007, and December 31, 2008, respectively. The reduction in the Over Advance Rate has placed stress on current and future liquidity.

38.     Absent a restructuring, the Company faced uncertainty beyond the next twelve months in the repayment of the principal amount of outstanding term loans, including the Term Loans, and the related interest and derivative transactions. Historically, J.G. Wentworth has met long-term liquidity needs through excess cash flow generated from operations, excess cash invested in highly liquid money market instruments, controlling its investment in marketing, or through the private or public issuance of debt or equity securities. However, because of current economic conditions, J.G. Wentworth has been unable to securitize assets at efficient pricing levels for much of 2008 and the first quarter of 2009.

39.     Since 1997, J.G. Wentworth completed 19 securitizations totaling approximately $2.1 billion and representing $3.5 billion of payment streams. Beginning in March 2006 and continuing through September 2007, J.G. Wentworth securitized assets on a quarterly basis. It did not complete securitizations in the fourth quarter of 2007 or the third quarter of 2008 due to unfavorable market conditions. J.G. Wentworth completed securitizations in March 2008, May 2008, and December 2008. It obtained a financial guarantee on 13 of these securitizations from MBIA Insurance Corporation, or MBIA, in order to enhance the credit rating of the securities to "AAA" on the senior tranches in their transactions. In June 2008 Standard & Poor's and Moody's downgraded MBIA from AAA to BBB+ and from Aaa to A2, respectively. Moody's

18

again downgraded MBIA to Baa1 in November 2008. In February 2009 Standard & Poor's and Moody's downgraded MBIA to BBB+ and B3, respectively. The credit ratings of the Company's securities insured by MBIA were downgraded by the rating agencies below AAA/Aaa as a result of the downgrades to MBIA. Beginning in the first quarter of 2008, J.G. Wentworth began conducting securitizations that, due to market demand, did not include financial guaranty insurance. A substantial portion of the bonds were sold at the AAA level.

40.     As a result of the adverse conditions discussed above, J.G. Wentworth had insufficient cash to make a scheduled payment of $6.1 million of interest on the Term Loans and Derivatives that was due on March 31, 2009. Accordingly, J.G. Wentworth engaged in discussions with the Prepetition Lenders regarding a restructuring of the outstanding indebtedness of the Company, resulting in the restructuring proposed by the Prepackaged Plan.

E.     **Negotiations of Prepackaged Plan**

41.     The Company faced significant liquidity issues as a result of the current credit crisis and the attendant dislocations in the securitization markets. Additionally, the forbearance under the non-debtor affiliate's Warehouse Facility with Deutsche Bank expired and Deutsche Bank ceased to fund the Facility on May 5, 2009, leaving the Company without access to liquidity. In order to address these issues, the Company engaged in discussions with its Prepetition Lenders regarding a consensual restructuring of the Company's outstanding indebtedness.

42.     Prior to the forbearance expiration, faced with a lack of liquidity and an inability to securitize or sell structured settlements at a profitable level, the Company began evaluating strategic alternatives. Throughout 2008, JGW and JLL actively pursued third party financing and evaluated related strategic M&A alternatives, including a sale, merger or comparable transactions. Specifically, the Company has actively pursued longer term, funding sources

19

including additional warehouse capacity; forward flow purchase facilities; and "whole receivable" sales. Likewise, smaller private placements and the exploration of strategic alternatives were not successful. To that end, on or about March 31, 2009, the Company retained the investment banking firm of Moelis & Company ("Moelis") to continue its pursuit of strategic alternatives and also commence discussions with the Term Lenders and Deutsche Bank regarding potential restructuring transactions.

43. The Company had tried with J.P Morgan, Jefferies, Goldman Sachs, and Deutsche Bank to pursue longer term alternative funding sources as well as smaller private placements and to explore strategic alternatives. Moelis was to continue these efforts, but also negotiate a restructuring with Term Lenders.

44. On April 8, 2009, the Company met with members of a steering group of the Term Lenders (the "Steering Committee") and the Agent and advised the Steering Committee and the Agent of the Company's liquidity crisis, its efforts to locate potential purchasers, investors, lenders, and potential sources of refinancing of the Company's debt. At that meeting, the Company likewise sought proposals from the Steering Committee and the Agent for investment, purchase or lending to the Company to alleviate its liquidity crisis. Thereafter, JLL presented several proposals to the Steering Committee and the Agent to restructure the Company's debt combined with an equity capital infusion in the Company.

45. On April 17, 2009, the Company again met with the Steering Committee and the Agent to continue discussions regarding JLL's proposals and to further negotiations with respect to liquidity solutions for the Company. Following that meeting, the Company and JLL continued to submit proposals to the Steering Committee and the Agent for the restructuring of the Company's debt and alleviation of its liquidity crisis.

46750/0001-5539858v8

46. On April 28, 2009, the Company, JLL, the Agent and the Steering Committee members entered in to that certain support letter agreement (the "Support Agreement") whereby the Company, JLL, the Agent and the Steering Committee members agreed to negotiate in good faith definitive documentation regarding the Exchange and JLL Investment transactions contemplated by the Prepackaged Plan. Moreover, pursuant to the Support Agreement the Prepetition Lender signatories to the Support Agreement approved and agreed to vote to accept the Prepackaged Plan on the same economic terms and otherwise in all material respects on the terms set forth in the term sheet attached to the Support Agreement (the "Term Sheet").

47. The Term Sheet, among other things, sets forth the terms of the Exchange, the JLL Investment, the Priming Loan, the DIP Facility and the New Preferred Interests. Pursuant to the Support Agreement, the Steering Committee and the Agent likewise agreed that to the extent that JLL provided funding to JGW by, among other things, purchasing on a whole receivable basis structured settlement receivables originated by JGW in accordance with the Term Sheet, each of the Term Lender signatories to the Support Agreement agreed to waive any restriction on affiliate transactions under the Term Loan Facility that might otherwise be deemed to prohibit the purchase of structured settlement receivables as described in the Support Agreement and in the Term Sheet. The Term Lender signatories to the Support Agreement likewise agreed to enter into an amendment to the Term Loan Facility in order to effectuate the foregoing.

48. The Support Agreement will terminate upon the first to occur (the "Termination Date") of (a) the execution of the Exchange Agreement and any other definitive documentation required for the consummation of the transactions contemplated by the Term Sheet; (b) the consummation of the transactions contemplated in the Term Sheet and the Exchange Agreement (which, if the transactions contemplated therein are effected by means of the Plan, will be the

date on which the Plan becomes effective); (c) any court of competent jurisdiction or other competent governmental or regulatory authority issuing an order making illegal or otherwise restricting, preventing or prohibiting the consummation of the transactions contemplated in the Term Sheet and the Exchange Agreement in a way that cannot be reasonably remedied by JGW; (d) upon the occurrence of any material breach of the Support Agreement by JLL or JGW, on the one hand, or any Term Lender, on the other hand, provided that the non-breaching party will have given written notice of such breach to the breaching party and such breach will not have been cured within three (3) days after receipt of such notice; and (e) May 30, 2009, provided, however, that if there is a delay in consummating the transactions contemplated by the Term Sheet caused by any scheduling issue in a bankruptcy case commenced in connection with the Term Sheet, such Termination Date will be extended (i) in the event of a Delay Breach Event (as defined below) by JGW or JLL, on the one hand, or the Term Lenders, on the other hand, at the option of the non-breaching party, or (ii) in the event that there is no Delay Breach Event, at the option of either JLL or the Term Lenders; provided that the Termination Date will not be extended beyond July 11, 2009, except by mutual agreement of the parties thereto. Under the Support Agreement, JGW, JLL and the Term Lenders also agreed to use their respective commercially reasonable efforts to cause the transactions contemplated by the Term Sheet to be consummated as soon as practicable after the date thereof, and to not take any action to hinder the bankruptcy process. Any failure of a party to the Support Agreement to comply with its obligations under the preceding sentence is referred to as a "Delay Breach Event."

49.     Prior to the Termination Date, the Term Lenders signatory to the Support Agreement agreed to deal exclusively with JLL with respect to any plan of reorganization or similar transaction involving JGW or its assets and that, without the prior written consent of JLL

and JGW, they will not (A) directly or indirectly sell, assign, grant an option with respect to, transfer or otherwise dispose of any of the aggregate principal amount of Loans outstanding under the Term Loan Facility, in whole or in part, unless the transferee is a signatory to the Support Agreement or agrees in writing to be bound by the terms of the Support Agreement with respect to such principal amount of Loans outstanding under the Term Loan Facility purchased by such transferee as though it was an original signatory to the Support Agreement; (B) directly or indirectly (including through their directors, members, managers, officers, representatives, subsidiaries, affiliates or associates) initiate contact with, (i) solicit, encourage or disclose (and shall immediately cease any such current contacts or disclosures) any information concerning JGW or the Support Agreement to, (ii) afford any access to JGW's personnel, offices, facilities, properties, assets, books and records to, or (iii) enter into any discussion, negotiation or agreement with (and shall immediately cease any such current discussions, negotiations or agreements), any person or entity (other than the intended parties to the Exchange Agreement), in each case, in connection with any plan of reorganization, acquisition or purchase of equity interests or assets of JGW or any of its subsidiaries or relating to a merger, consolidation, share exchange, or other business combination involving JGW or any of its subsidiaries, whether directly or indirectly, by operation of law or otherwise; or (C) directly or indirectly, request the formation of, or agree to serve on, any official committee in any bankruptcy case commenced by JGW or any of its affiliates.

50.     Each Term Lender signatory to the Support Agreement further agreed that prior to the Termination Date it will not object to, or otherwise commence any proceeding to oppose the consummation of the transactions contemplated in the Term Sheet and the Exchange Agreement, including confirmation of the Plan or the transactions contemplated thereby, and will not take

46750/0001-5539858v8

any action that is materially inconsistent with, or that would unreasonably delay the consummation of, such transactions. In addition, each Term Lender signatory to the Support Agreement agreed not to revoke or withdraw its vote to accept the Plan.

**F.      Solicitation and Commencement of Chapter 11 Cases**

51.      Upon finalization of the Support Agreement, the Term Sheet, the Exchange Agreement and the terms of the Plan, all of which included the input and consent of the Steering Committee and the Agent, on May 7, 2009, the Company (with the assistance of Logan & Company, Inc. ("Logan" or the "Solicitation Agent")) commenced solicitation of consents for the Exchange Agreement and acceptances of the Prepackaged Plan from holders of Class 4 Prepetition Lender Claims, by distributing a solicitation package (the "Solicitation Package") that included a Disclosure Statement and the Prepackaged Plan to holders of Class 4 Prepetition Lender Claims.

52.      The Company solicited consents to the Exchange and acceptances of the Plan simultaneously. The Solicitation Package established May 15, 2009 at 5:00 p.m. (prevailing Eastern time), as the voting deadline (the "Voting Deadline") for the holders of Class 4 Prepetition Lender Claims to submit votes to accept or reject the Prepackaged Plan.

53.      I am informed that the Solicitation Agent received ballots from the holders of Class 4 Prepetition Lender Claims with respect to the Prepackaged Plan as follows:

| Class 4 | 145 | 99.32% | $338,037,937.50 | 99.41% | 1 | 0.68% | $2,000,000 | 0.59% |
|---------|-----|--------|------------------|--------|---|-------|------------|-------|

See Declaration of Kathleen M. Logan Certifying Voting on, and Tabulation of, Ballots Accepting and Rejecting Prepackaged Plan of Reorganization for JGW Holdco, LLC, J.G.

24

Wentworth, LLC and J.G. Wentworth, Inc., filed with the Court on May 19, 2009 (the "Voting Declaration").[4]

54.     The Debtors do not contemplate any additional solicitation of votes to accept or reject the Prepackaged Plan.  Therefore, because an overwhelming majority of the holders of the Class 4 Prepetition Lender Claims (holding in excess of two-thirds in amount of the amount) voted to accept, or are otherwise in favor of, the Prepackaged Plan, the Debtors filed their voluntary petitions for reorganization relief in order to complete the Exchange through the Prepackaged Plan.

55.     The Debtors filed these chapter 11 cases to effectuate and implement the Prepackaged Plan.  The Debtors have obtained the requisite votes to confirm the Prepackaged Plan from the holders of claims and interests entitled to vote on the Prepackaged Plan and, thus, the Debtors intend to proceed towards swift confirmation of the Prepackaged Plan to both (i) complete the Exchange and (ii) take advantage of section 1145 of the Bankruptcy Code to bind the non-tendering holders of the Class 4 Prepetition Lender Claims to the terms of the Prepackaged Plan.

## G.     Summary of the Prepackaged Plan[5]

56.     The Prepackaged Plan provides for the restructuring of the Company's liabilities in a manner designed to maximize recoveries to holders of claims against and interests in the Company.  The Plan contemplates consummation of the Exchange, pursuant to which JGW will

---

[4] In total, there were 162 claimants entitled to vote in Class 4, of which 146 (or 90.12%) cast ballots.  As noted above, all but 1 of those actually casting ballots voted in favor of the Plan. Additionally, certain claimants, while voting to accept the Plan (in response to Item 2), voted to reject the Exchange Agreement or failed to make any election (in response to Item 3).

[5] This summary is qualified in its entirety by reference to the specific provisions of the Prepackaged Plan.  The terms of the Prepackaged Plan shall govern in the event of any inconsistency between this summary and the Prepackaged Plan.

acquire from each Prepetition Lender, and each Prepetition Lender will transfer, assign and deliver to JGW, all of such Prepetition Lender's rights and obligations under each Loan, free and clear of any liens and any Evidence of Indebtedness shall thereafter be held of record by JGW, and, in the case of the Derivatives, Deutsche Bank and the Debtors shall have no further rights against or obligations to each other under the Derivatives. In exchange for the acquisition of the Loans held by each Prepetition Lender, JGW will pay cash to such party and/or issue to such party the New Preferred Interests, in each case in an amount determined as set forth in the Plan in full satisfaction and settlement of any Claims held by such Lender. Simultaneously with the Exchange on the Effective Date, (i) in exchange for Holdco Common Interests, Distribution LLC or another affiliate of JLL will invest in Holdco the JLL Investment[6]; (ii) Holdco will contribute to Reorganized JGW the JLL Investment; and (iii) the amount funded to JGW by the Term Lenders through the purchase of Structured Settlements will be paid to the Term Lenders, either

---

[6] The JLL Investment is defined in the Prepackaged Plan as follows:

On the Effective Date, and simultaneously with the consummation of the Exchange, (i) in consideration for the issuance by Holdco to JLL of a number of Holdco Common Interests equal to the sum of the JLL Investment (as defined below) divided by Fifty Cents ($0.50), Distribution LLC or another affiliate of JLL will invest in Holdco (A) an amount in cash equal to (1) One Hundred Million Dollars ($100,000,000) minus (2) any cash funded by Distribution LLC by means of the purchase of Structured Settlements on a whole receivable basis from JGW during the Structured Settlement Purchase Period (as defined in the Exchange Agreement), in which case JLL will cause Distribution LLC or such other affiliate to contribute its interest in such Structured Settlements to Reorganized Holdco at the Effective Date as part of the consideration for the issuance of Holdco Common Interests, and (B) any cash necessary for Holdco to fund JGW's purchase of the Loans pursuant to the Exchange, which amount shall not exceed Thirty Four Million Seven Hundred Seventy-Five Thousand Dollars ($34,775,000) (the "Aggregate Cash Consideration") (the sum of clause (A) and (B) above, including any Structured Settlements described in clause (A), the "JLL Investment") ...

See Prepackaged Plan at Article IV.A.

directly or through the limited liability company formed by Distribution LLC for the purpose of holding such receivables, as the purchase price for such receivables.

57.     The Prepackaged Plan also provides, among other things that each class of creditors or interest holders (other than those Prepetition Lender Claims in Class 4) will be reinstated and unimpaired.  Additionally, all executory contracts and unexpired leases will be assumed.

58.     Assuming full Prepetition Lender participation in the Equity Election, the Debtors anticipate that the corporate structure of the Debtors following the Effective Date will be as follows:



59.     The Debtors believe that (i) through the Plan, holders of Allowed Claims will obtain a substantially greater recovery from the estate of the Debtors than the recovery they would receive if (a) the Debtors filed their Chapter 11 petitions without prior approval of the Plan by a majority of their creditors or (b) the Debtors filed for Chapter 7 protection, and (ii) the

46750/0001-5539858v8

Plan will afford the Debtors the opportunity and ability to continue its business as a viable going concern and preserve ongoing employment for the Debtors' employees.

## PART II

60.     In furtherance of the restructuring efforts embodied in the Plan, the Debtors filed these bankruptcy cases and expect to file a number of First Day Motions, each as identified below.  I have reviewed each of the First Day Motions and proposed forms of order relating thereto (and the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.[7]  Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtors' successful reorganization through the Plan.  Moreover, I believe that, for the reasons set forth in the First Day Motions, the relief requested therein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

61.     The requested relief in all of the First Day Motions is further supported by the prepackaged nature of these cases.  As set forth above and in the Voting Declaration, the Debtors solicited votes on the Prepackaged Plan from the only class of holders of claims entitled to vote to accept or reject the Prepackaged Plan.  The votes tabulated and received from this class demonstrate overwhelming acceptance of the Prepackaged Plan.  The most critical and complex task required to effectuate a successful reorganization – the negotiation and formulation of a chapter 11 plan of reorganization – has already been accomplished.  Thus, the Debtors respectfully submit that given the backdrop of these prepackaged chapter 11 cases, the relief

---

[7] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the relevant First Day Motion and/or accompanying Order.

requested in the First Day Motion is appropriate inasmuch as such relief will assist the Debtors to move towards expeditious confirmation of the widely-supported Prepackaged Plan with the least possible disruption or harm to their businesses.

62.     As a financial services business in a highly competitive environment, the Debtors cannot afford a protracted stay in chapter 11. Trust and reputation are J.G. Wentworth's most important assets and keys to its continued success. The Debtors, therefore, intend to proceed expeditiously to confirm the Plan and emerge from chapter 11 as quickly as possible. As set forth in the Solicitation Procedures Motion, the Debtors seek a confirmation hearing on or about June 1, 2009. Even the slightest delays beyond that schedule could cause unrest and inexorably harm the Debtors' ability to preserve the J.G. Wentworth business from misinformation about the nature of the proceeding, whether imparted by the Debtors' competitors or as created by uncertainty in the marketplace felt by J.G. Wentworth's customers or the courts that approve the purchase of structured settlements. Indeed, competitors, as they have in the past, will seize every opportunity to disseminate misinformation regarding the nature of this proceeding and accounts of J.G. Wentworth's "demise" in an effort to gain a competitive advantage.

63.     Additionally, confirmation permits the consummation of the underlying exchange transaction and the infusion of the JLL Investment of $100 million and, thus, ready access to the capital necessary to maintain the strength and competitive edge the Debtors enjoy and quell any concern (real or perceived) about J.G. Wentworth's stability and ability to promptly fund the purchase of structured settlements. Delays risk having inadequate capital to service J.G. Wentworth's customers, which would frustrate customer (and court) expectations and cause a loss of goodwill. I believe that if the Debtors are required to remain in chapter 11 for any appreciable period of time, it will have detrimental impact on the Debtors' efforts to maintain

29

and continue developing a strong brand identity and a loyal customer base. Such an outcome would be potentially devastating to the Debtors' reorganization efforts.

64.     Moreover, J.G. Wentworth has entered into relationships with many customers to split certain payments. This means that J.G. Wentworth has only purchased a portion of a customer's payment and is responsible for passing the unpurchased portion of the payment to that customer. I believe that until J.G. Wentworth emerges from bankruptcy, many customers will be concerned about depending on the Company to remit the unpurchased portion of the payments. The longer the Company remains in bankruptcy, the more concerned these customers could become. Customers may even go so far as to sell these payments in order to avoid the perceived financial risk associated with depending on J.G. Wentworth to transfer their funds to them. J.G. Wentworth passes back approximately 1,165 payments representing $1,400,000 during the average month.

65.     In addition, without a quick exit from chapter 11, the Debtors' ability to retain its current employee levels may prove difficult, especially in light of the fact that the Company has had a recent mass layoff. That layoff naturally caused concern on the part of the remaining employees and the business cannot afford to have the relatively few remaining employees decide to leave because of extended uncertainty should this proceeding be prolonged in any fashion.

66.     I understand (as set forth above) that the only impaired class of creditors entitled to vote on the Plan – creditors holdings claims in Class 4 under the Plan – already have voted *overwhelmingly* to accept the Plan. Moreover, no other classes of creditors or holders of interests are impaired under the Plan. I do not believe, therefore, that the Debtors' estates and creditors would suffer *any* adverse impact as a result of proceeding so expeditiously. On the other hand, even the slightest delays in the process (i) cause unnecessary unrest among J.G.

Wentworth's creditors, employees, customers and the courts approving the purchase of structured settlements and fixed-price annuities, as well as all other parties in interest in these bankruptcy cases, (ii) damage the ongoing businesses of the Debtors and the value of the Debtors' estates and (iii) cause the Debtors to needlessly incur additional administrative expenses. Accordingly, on balance, and given the prior solicitation to those impacted by the Plan, with 99.32% in number of those voting in accepting impaired holders and 99.41% of those voting in amount, supporting confirmation, and given that no other parties are impaired under the Plan, I submit the 10-day period to conclude this case is sufficient under the circumstances and, given the potentially detrimental impact of any further delays beyond that 10-day period, is reasonable under the circumstances. Indeed, over 90% in number and amount of all Class 4 creditors voted on the Plan.

67.     Based on the foregoing, I believe that the relief requested in the First Day Motions, including the exit from these chapter 11 cases within the 10-day period sought, is necessary and appropriate, is in the best interests of the Debtors' estates and creditors, and should be granted in all respects.

**A.      Motion for Order Under Bankruptcy Rule 1015(b) and Delaware Bankruptcy Local Rule 1015-1 Directing Joint Administration of Related Chapter 11 Cases**

68.     The Debtors seek the joint administration of these chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

69.     Joint administration is appropriate in these chapter 11 cases because it will (i) ease the administrative burden of the Court and parties-in-interest, (ii) obviate the need for duplicative motions, notices, applications and orders, (iii) streamline the service of pleadings and notices on creditors and other parties-in-interest and (iv) allow the United States Trustee for the

31

District of Delaware (the "U.S. Trustee") and other parties-in-interest to monitor these chapter 11 cases by reviewing only one docket.

70.　　Finally, the rights of the Debtors' creditors and interest holders will not be adversely affected by the proposed procedural joint administration of these chapter 11 cases. The joint administration is for procedural purposes only and each creditor and party-in-interest will maintain whatever claims or rights it has against the particular estate in which it allegedly has a claim or right.

71.　　I believe that joint administration of the Debtors' chapter 11 cases is in the best interests of the Debtors, their creditors, and all parties-in-interest, and should be granted in all respects.

**B.　　Application Requesting Entry of an Order Under Sections 327(a), 328(a) and 329 of the Bankruptcy Code and Bankruptcy Rules 2014, 2016 and 5002 Authorizing Employment and Retention of Cole, Schotz, Meisel, Forman & Leonard, P.A. as Counsel for Debtors**

72.　　The Debtors seek to employ and retain the law firm of Cole, Schotz, Meisel, Forman & Leonard, P.A. ( "Cole Schotz"), effective as of the Petition Date, to represent the Debtors as their bankruptcy counsel in connection with the filing of their chapter 11 petitions and the prosecution of their chapter 11 cases. The Debtors have selected, and request to retain Cole Schotz as their bankruptcy counsel due to, among other things, (i) Cole Schotz's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, (ii) Cole Schotz's expertise, experience and background in dealing with the potential legal issues and problems that may arise in the context of these chapter 11 cases, and (iii) because of its expertise, experience, and knowledge in practicing before this Court, its proximity to the Court and its ability to respond quickly to emergency hearings and other emergency matters in this Court.

46750/0001-5539858v8

73.     As set forth below, by separate application filed simultaneously herewith, the Debtors are seeking to employ and retain the law firm of Reed Smith, LLP ("Reed Smith") as corporate and finance counsel in these cases. Cole Schotz is primarily responsible for the bankruptcy aspects of these cases for the Debtors, and Reed Smith is primarily responsible for the Debtors' corporate and finance issues. The Debtors submit that it is necessary and efficient for the Debtors to employ both Cole Schotz and Reed Smith in these cases. Although Cole Schotz and Reed Smith will necessarily consult with each other, Cole Schotz and Reed Smith have assured the Debtors that they will make every effort to avoid and/or minimize duplication of services in these cases.

74.     Based on the foregoing, I believe that retention and employment of Cole Schotz in connection with these chapter 11 cases is in the best interests of the Debtors' estates.

## C.     Application for an Order Under Sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rules 2014 and 5002 Authorizing Employment and Retention of Moelis & Company as Financial Advisor to the Debtors

75.     The Debtors are requesting authority to employ and retain Moelis as their financial advisor effective as of the Petition Date. The Debtors have selected Moelis as their financial advisor based upon (i) Moelis' extensive experience in providing financial advisory and investment banking services in large and complex chapter 11 cases, and (ii) Moelis' excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States.

76.     Moreover, during Moelis' provision of services to the Debtors prepetition, Moelis' professionals have worked closely with the Debtors' management and other professionals and have become well acquainted with the Debtors' operations, financial condition, debt structure, creditors, businesses and operations and related matters. Accordingly, Moelis has

33

developed significant relevant experience and expertise regarding the Debtors that will assist it in providing effective and efficient services in these cases.

77.     Based on the foregoing, I believe that retention and employment of Moelis in connection with these chapter 11 cases is in the best interests of the Debtors' estates.

**D.      Application of the Debtors and Debtors in Possession for an Order Authorizing the Retention and Employment of Reed Smith, LLP as Special Corporate and Finance Counsel to the Debtors Nunc Pro Tunc to the Petition Date Pursuant to Section 327(e) of the Bankruptcy Code**

78.     The Debtors wish to employ Reed Smith as their special corporate and finance counsel in connection with the their chapter 11 cases and to perform the extensive legal services that will be necessary during the chapter 11 cases.  Reed Smith has rendered extensive legal services and corporate advice to the Debtors and has represented the Debtors across a broad spectrum of practice areas including corporate and finance, employment, litigation and tax since 1998.  In light of Reed Smith's familiarity with the businesses, financial and legal affairs of the Debtors based on its longstanding representation of the Debtors, I believe that retention and employment of Reed Smith in connection with these chapter 11 cases is in the best interests of the Debtors' estates.

**E.      Debtors' Motion for Entry of Order (A) Scheduling an Objection Deadline and Combined Hearing on their Disclosure Statement and Plan Confirmation, (B) Approving Form and Notice of Confirmation Hearing, (C) Establishing Procedures for Objections to their Plan and Disclosure Statement, (D) Approving Solicitation Procedures and (E) Granting Related Relief**

79.     The Debtors are seeking entry of an order (i) scheduling a combined hearing to consider (a) approval of the adequacy of the Disclosure Statement, and (b) confirmation of the Prepackaged Plan, (ii) approving the solicitation and voting procedures, including the forms of ballots, and (iii) approving the form, manner and sufficiency of the notice of the combined hearing.

46750/0001-5539858v8

80.     As set forth in the Plan and the Disclosure Statement, the holders of Administrative Expense Claims, Priority Tax Claims, Other Priority Claims (Class 1), Other Secured Claims (Class 2), General Unsecured Claims (Class 3), JGW Common Interest (Class 5), Holdco Common Interests (Class 6) and JGW Equity Interests (Class 7) are unimpaired. Prior to the Petition Date, the Debtors solicited votes on the Prepackaged Plan from the holders of the Class 4 Prepetition Lender Claims. As set forth in the Voting Declaration, the requisite number of creditors in Class 4 (the only class entitled to vote under the Plan) voted to accept the Prepackaged Plan pursuant to section 1126 of the Bankruptcy Code. I believe that such acceptances are sufficient to confirm the Prepackaged Plan pursuant to section 1129(b) of the Bankruptcy Code.

81.     Because the only impaired class of claims and interest holders entitled to vote accepted the Prepackaged Plan, there is no reason to delay consideration of the Disclosure Statement and confirmation of the Prepackaged Plan.

82.     The hallmark of J.G. Wentworth's business has been the ability to promptly provide liquidity to the holders of structured settlements and fixed-payment annuities who have a present need for funds. The Exchange Agreement and the concomitant investment by JLL of $100 million will assure that there is a ready source of funds to purchase structured settlements in light of current financial market conditions and termination of the Warehouse Facility. Any delay in confirming the Prepackaged Plan threatens J.G. Wentworth's ability to live up to the reputation of excellence and as a prompt and efficient source of funds for those desiring to sell the income stream of a structured settlement or fixed-payment annuity. I submit that the harm to the J.G. Wentworth Entities' businesses will increase exponentially the longer the Debtors are in bankruptcy and the scheduling of the combined hearing at this time will inform creditors and

35

interest holders as early as possible of the date of the combined hearing. The proposed schedule affords creditors and interest holders reasonably ample notice of the combined hearing under the circumstances and an opportunity to obtain a copy of and to evaluate the Prepackaged Plan and Disclosure Statement in advance of the proposed combined hearing. Therefore, I submit that no party-in-interest will be prejudiced by the relief requested in this motion.

**F.     Motion for Authority to (i) Enter into DIP Financing; (ii) Use of Cash Collateral, and Utilize the Proceeds thereof for Operations of Non-Debtor Operating Subsidiaries and (iii) Continue Using Existing Bank Accounts and Cash Management Systems**

83.     Upon the termination of the Warehouse Facility, the Company required a source of funding to meet the operations of the J.G. Wentworth Entities, including the funding of purchased structured settlements consistent with Court orders in various jurisdictions throughout the country. As noted above, to continue operations in the "ordinary course,"[8] the Company recently entered into the Priming Loan funded by Distribution LLC, an entity affiliated with JLL.

84.     Distribution LLC has also agreed to provide financing to the Company on a post-Petition Date basis consistent with the terms of the DIP Financing more particularly described in the accompanying DIP Motion.

85.     I submit that continued financing is critical to the Debtors' operations during the pendency of the Chapter 11 Cases. The Debtors could not find financing on better (or

---

[8] Through May 5, 2009, J.G. Wentworth funded the acquisition of structured settlements and fixed-payment annuities through the Warehouse Facility. Borrowings under the Warehouse Facility were made by non-debtor affiliate, 321 Henderson Receivables Acquisition LLC, which in turn funded settlements and annuities acquired by another non-debtor affiliate, 321 Henderson Receivables Originations, LLC. Annuities are held by non-debtor affiliate RC Henderson Trust. Monies then flowed "upstream" to, among other things, fund J.G. Wentworth's operating costs. When the funding under the Warehouse Facility terminated, the Priming Loan was put in at the JGW level and "downstreamed" to the non-Debtor subsidiaries to be used to fund operations and the continued purchase of structured settlements. While the J.G. Wentworth Entities continue normalized "operations" in the ordinary course, the flow of funds has changed since the implementation of the Priming Loan.

comparable) terms prior to the Petition Date and I believe that absent the restructuring contemplated by the Prepackaged Plan, the Term Loan Lenders would not have consented to a priming loan.

86.     As set forth in the DIP Motion, subject to the approval of the Bankruptcy Court, the Debtors propose to enter into a debtor-in-possession financing facility, and use cash collateral, as that term is defined in section 363(a) of the Bankruptcy Code.  That facility will provide the Debtors with up to $10 million in additional liquidity (inclusive of amounts provided pursuant to the Priming Loan) to fund the operations of the non-debtor affiliate entities, including the continued purchase of structured settlements during the Chapter 11 Cases (the "DIP Financing").  The DIP Financing includes a roll-up of the Debtors' prepetition debt incurred pursuant to the Priming Loan.  The Priming Loan and DIP Facility provide for a priming lien on collateral currently securing the obligations under the Term Loan Facility and Derivatives.  However, the Term Lenders and Deutsche Bank have consented to the priming lien and will have no objection to the DIP Facility and the roll-up under the DIP Financing.  The DIP lender will also have a first lien on structured settlements and fixed-payment annuities that are purchased after the Petition Date.

87.     The principal terms of the DIP Financing are summarized below.[9]

| DIP Facility | |
|---|---|
| *Borrower* | J.G. Wentworth, LLC |
| *Guarantors* | Guarantors under the Priming Loan and the Term Loan Facility. |

---

[9] In the case of any inconsistency between this summary and the DIP Facility Agreement, the terms of the DIP Facility Agreement shall control.  Capitalized terms not otherwise defined in the chart shall have the meaning ascribed to them in the DIP Facility Agreement.

| DIP Facility | |
|---|---|
| *Lender* | Participating Lenders under the Term Loan Agreement (the "DIP Lenders") and JLL or an entity to be formed by JLL (the "JLL Lender"); provided that the DIP Lenders shall not be permitted to fund more than 49% of the aggregate principal amount of the DIP Facility. |
| *Availability* | The DIP Lenders and the JLL Lender will make available to the Company up to $10 million (net of any amounts funded through the purchase of Structured Settlements by JLL and any participating Term Lenders prior to the date the DIP Facility becomes available) pursuant to a senior secured, first lien priming loan senior to the Loans. Draws under the DIP Facility will occur as needed solely in accordance with an agreed upon budget. |
| *Maturity* | The DIP Facility will be due and payable on the earlier of (x) an acceleration by the Lenders holding loans outstanding under the DIP Facility in excess of 50% in principal amount following the occurrence of an Event of Default (defined below) under the DIP Facility Agreement or (y) May 30, 2009 (the "Maturity Date"); provided, however, that if there is a delay in consummating the transactions contemplated by the Plan caused by scheduling issues in a bankruptcy case commenced in connection with the Plan, and at the time no event of default under the DIP Facility Agreement has occurred and is continuing, such Maturity Date shall be extended (i) in the event of a Delay Breach Event by JGW or JLL, on the one hand, or the Term Lenders, on the other hand, at the option of the non-breaching party, or (ii) in the event that there is no Delay Breach Event, at the option of either JLL or the Term Lenders.<br><br>JLL and the Term Lenders will also agree (a) to use their respective commercially reasonable efforts to cause the transactions contemplated by the Plan to be consummated as soon as practicable after the date thereof, and will not take any actions to hinder the bankruptcy process; (b) that no additional funding will be made available under the DIP Facility in the event of an extension contemplated above; and (c) in no event will the Maturity Date be extended past July 11, 2009. |
| *Priority and Security* | First priority priming lien upon all collateral of the Loans (the "Priming Liens"). |
| *Interest* | Prime rate (Payment-in-kind). |

38

| DIP Facility | |
|---|---|
| **Commitment and Other Fees** | None. |
| **Expenses** | JGW will reimburse the Administrative Agent for the DIP Facility and the JLL Lender (solely in such capacity) for the reasonable attorneys fees and expenses incurred by each of them. JGW will fund a $150k retainer to counsel to the Agent for expenses incurred through consummation of the Plan. |
| **Events of Default** | The occurrence of any one or more of the following events (each such event and the expiry of the cure period, if any, provided in connection therewith, being herein referred to as an "Event of Default") shall constitute a default under the DIP Facility Agreement:<br><br>1. Failure by the Company to perform or comply with any term, condition, covenant or obligation contained in the DIP Facility Agreement, on its part to be performed or complied with where any such failure to perform or comply is not remedied within three (3) business day's written notice of the default (except to the extent that such failure to perform or comply has been caused by JLL).<br><br>2. If the DIP Facility and/or DIP Facility Agreement ceases to be in full force and effect or is declared by any court to be null and void or the validity or enforceability thereof is contested by the Company or the Company denies in writing that it has any further liability or obligation hereunder (except to the extent that such failure to perform or comply has been caused by JLL) or DIP Lenders and the JLL Lender ceases to have the benefit of the Priming Liens.<br><br>3. Revocations of votes in favor of the Plan sufficient to lower the acceptance rate below the rate of at least (i) two-thirds in amount of the Allowed Claims actually voting in Class 4 and (ii) more than one-half in number of the Allowed Claims actually voting in Class 4. |
| **Additional Events of Default** | The documentation for the DIP Facility will include other events of default which shall be consistent with those included in the Term Loan Facility except as necessary to adjust for the Company's Chapter 11 filing and its current financial condition.<br><br>The covenants, representations and warranties in the DIP Facility shall be consistent with those in the Senior Secured Term Loan except as necessary to adjust for the Company's Chapter 11 filing and its current financial condition. |

46750/0001-5539858v8

| DIP Facility | |
| --- | --- |
| *Repayment* | Upon consummation of the JLL Investment, the DIP Facility will be repaid from the proceeds of such JLL Investment. |

88.     The Company proposes to use the proceeds of the DIP Financing to fund intercompany financial transactions (collectively, the "Intercompany Transactions") to maintain the "ordinary course" of the J.G. Wentworth Entities' businesses.  Transfers of cash to and from J.G. Wentworth's existing bank accounts, though historically flowing upstream, are routinely made on account of the Intercompany Transactions, which typically include payments for the funding, if necessary, of the Debtors' and their affiliates' working capital requirements including, but not limited to, the purchase of structured settlements.  If the Intercompany Transactions were to be discontinued, operations would be disrupted to the detriment of the Debtors and their estates.

89.     The following summarizes the intended flow of funds, for which the Debtors seek approval:

46750/0001-5539858v8

**Proposed DIP Financing Cash Movement**



1.  DIP lender(s) wire funds daily to 321 Henderson Receivables Origination, LLC ("321 HRO")
2.  321 HRO funds purchases of structured settlements and annuities from sellers
3.  321 HRO pays vendors related to asset origination including marketing, as well as most professional and consulting fees
4.  321 moves funds to Green Apple Management, LLC (GAM)
5.  GAM pays general and administrative costs, including payroll, rent, utilities, etc.
6.  321 HRO moves funds to J.G. Wentworth SSC, LP (SSC)
7.  SSC pays certain general and administrative costs including bank fees, in addition to legal costs related to offline pre-Act structured settlements

90.     All Intercompany Transactions involving Debtor entities will be reported on the

Debtors' monthly operating reports.  The continued performance of the ordinary course

Intercompany Transaction is critical to insuring the Debtors' ability to operate their businesses as

debtors-in-possession without interruption.

91.     In this regard, and because the Debtors will seek to have the Plan confirmed on or

about June 1, 2009, the Debtors intend to seek authority to continue using their existing bank

accounts, cash management systems and business forms and to follow their internal investment

and deposit guidelines. Absent the Bankruptcy Court's approval of the continued use of the cash management system, cash flow among the Debtors and its non-debtor affiliates would be impeded to the detriment of their estates and their creditors.[10]

92.     Continued use of the existing cash management system will facilitate the Debtors' smooth and orderly transition into chapter 11, minimize the disruption of J.G. Wentworth's businesses while in chapter 11 and expedite their emergence from chapter 11. As a result of set up time and expenses, requiring the Debtors to adopt and implement a new cash management system would create an administrative hardship likely to increase the costs of the Chapter 11 Cases and disrupt normal operations. For the same reasons, requiring the Debtors to cancel their existing bank accounts and establish new accounts or requiring the Debtors to create new business forms would only frustrate the Debtors' efforts to reorganize expeditiously.

**G.      Motion for Entry of an Order Authorizing the Debtors and their Non-Debtor Affiliates to Continue to Enter into and to Honor New and Existing Agreements to Purchase Structured Settlements and Fixed-Payment Annuities and Allow Court Proceedings to Approve Structured Settlement Purchases to Continue in Accordance with their Existing Cash Management System as Modified by the DIP Financing Order**

93.     In order to avoid disruption in the Debtors' businesses and/or confusion among the various courts and participants in structured settlement purchase transactions, the Debtors intend to continue to utilize JGW's non-debtor affiliate 321 Henderson Receivables Originations, LLC to purchase and pay for structured settlements in accordance with court proceedings.

94.     One of many justifications for seeking this authority is to avoid violating any such court orders authorizing these transactions.

---

[10] As noted above, while the Company proposes to maintain its current bank accounts and cash management systems, the flow of funds will differ from historical practices.

95.     The DIP Financing will be utilized in part to fund the operations at the non-debtor affiliate level, including the purchases of these structured settlements and fixed-payment annuities. The Debtors will seek an order confirming their authority to continue to provide funding and maintain the purchase of structured settlements during the Chapter 11 Cases in the ordinary course of business.

96.     I believe that granting the relief requested in this motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interests.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: May 19, 2009

Name: David Miller
Title: Chief Executive Officer of JGW Holdco, LLC, J.G. Wentworth, LLC and J.G. Wentworth, Inc.

43